UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| POLO REALTY INC. d/b/a ROYAL PALM POLO SPORTS CLUB, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CAUSE NO.: 1:10-CV-144-TLS ) |
| KRUSE, INC. d/b/a KRUSE INTERNATIONAL, and AUBURN AUCTIONS, LLC, | ) ) ) |
| Defendants. | ) ) |

**OPINION AND ORDER**

This matter is before the Court on two motions pending in this cause: Defendant Kruse Inc.'s (Kruse International) Motion for Plaintiff to Show Cause Why It Should Not Be Held in Contempt [DE 12], and the Plaintiff's Motion for Preliminary Injunction Upon Emergency Hearing [DE 21]. For the reasons stated in this Opinion and Order, both motions will be denied.

**PRELIMINARY INJUNCTION STANDARD**

The Plaintiff's Motion for Preliminary Injunction primarily seeks to enjoin Kruse International from transferring to Defendant Auburn Auctions, LLC (Auburn Auctions) its right to conduct an auction. In determining whether a situation merits a preliminary injunction, a district court conducts a two-phase analysis. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1085–86 (7th Cir. 2008). First, the threshold phase requires a party seeking the injunction to satisfy three requirements: (1) "that absent a preliminary injunction, it will suffer irreparable harm in the interim," (2) "that traditional legal remedies would be inadequate," and (3) "that its claim has some likelihood of succeeding on the merits."

*Id.* at 1086 (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). If the moving party passes this threshold phase, the court moves to the balancing phase. *Id.*

In this second phase, a court, in an attempt to minimize the cost of potential error, "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* (quotation marks and citations omitted). Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Id.* In so doing, the court employs a sliding scale approach: "'[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties. *Id.* Taking into account all these considerations, the district court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.*

## BACKGROUND

This Opinion and Order is a companion to the Opinion and Order that the Court issued earlier this day, in which the Court dismissed Count One of the Plaintiff's Complaint because of the Court's lack of jurisdiction to register and enforce a state court judgment, and also denied as moot a motion relating to Count One. That previously-issued Opinion and Order contains a

background section that details the procedural and factual history of this case. The Court here incorporates that section by reference, but will go into greater detail regarding the procedural history of the Motion for Preliminary Injunction Upon Emergency Hearing.

That Motion, filed on May 13, 2010, seeks many different forms of injunctive relief premised on the Defendants' alleged violation of the Indiana Uniform Fraudulent Transfer Act (IUFTA).[1] Kruse International filed its Response in Opposition [DE 23] on the same day. On May 17, the Court held an evidentiary hearing on the Motion for Preliminary Injunction, during which the Court admitted three affidavits into evidence and heard argument from counsel for the Plaintiff, Kruse International, and Auburn Auctions. At the conclusion of that session, the Court continued the evidentiary hearing until June 3, and advised the parties that they would be permitted to submit supplemental briefing in anticipation of the second part of the hearing. On June 2, the Plaintiff filed its Supplemental Brief in Support of Motion for Preliminary Injunction [DE 42]. Neither Defendant filed a supplemental brief at that time. On June 3, the Court held the second part of the evidentiary hearing. The parties submitted documentary evidence to the Court, and the CEOs of Polo Realty, Kruse International, and Auburn Auctions testified and were cross-examined.

After the presentation of the evidence, counsel for the Plaintiff advised the Court that the Plaintiff had narrowed the relief it was seeking in its Motion for Preliminary injunction to the following: (1) Kruse International being enjoined from transferring to Auburn Auctions the right to conduct any auctions on behalf of Kruse International, and (2) both Defendants being enjoined from disbursing, destroying, erasing, disposing of or deleting any of the records documenting the

---

[1] The relief sought was drastically narrowed by Plaintiff's counsel at the June 3, 2010, evidentiary hearing, as detailed below.

3

bidding, auctioning, consignment, payment, receipt of payment, and monies of any kind that were transferred, obligated, received, or paid during or as a result of the 19th Annual Auburn Spring Motorfair Auction to be held on May 14–17, 2010, in Auburn, Indiana.

.	At the conclusion of the hearing, the Court ordered the parties to submit a supplemental brief on what had become the lone outstanding material legal issue in the hearing: whether the right to conduct an auction is considered a property right under Indiana's version of the Uniform Fraudulent Transfer Act. The Plaintiff, Kruse International, and Auburn Auctions each submitted a supplemental brief pursuant to that order on June 15. The Motion is now ripe for ruling.

## STATEMENT OF MATERIAL FACTS

The evidence before the Court reveals a set of facts that is materially uncontested by the parties,[2] and the primary dispute in this case appears to be legal rather than factual. The facts are recited here.

At all times relevant, Dean Kruse was the sole stockholder, president, and CEO of Kruse International, a company that conducted automobile auctions. The Plaintiff owns and operates the Royal Palm Polo Sports Club in Boca Raton, Florida, which is a large open-air venue suitable for holding car auctions. In a series of judgments and orders in late 2009 and early 2010, Judge David French of the Palm Beach County Court, a state court located in Florida, found Kruse International liable to the Plaintiff in the amount of $250,799.38 for breaching a lease that

---

[2] The Court notes that the parties had not engaged in a full period of discovery before the hearing and thus the evidence presented may ultimately prove to be an incomplete record of the facts in this case. However, the nature of a preliminary injunction proceeding demands that the Court make preliminary factual determinations in order to determine whether relief is warranted. The Court thus finds these facts for the limited purpose of ruling on the Plaintiff's Motion for Preliminary Injunction, but does not intend for these findings to preclude further presentation and argument on these facts.

had been executed between the two parties on October 1, 2008.

By January 2010, Kruse International owed significant debts to approximately eighty creditors throughout the United States, including the Plaintiff. Finding itself unable to pay its creditors or its operating costs, Kruse International had ceased all business activity by the end of that month. Kruse International has neither conducted any auctions nor otherwise functioned as a business since January 2010. At least partly as a result of Kruse International incurring these debts, the State of Indiana suspended Kruse International's auctioneer's license for seven years in May 2010. Kruse International was also fined $35,000. Dean Kruse's personal auctioneer's license was suspended for two years, and he also incurred a fine.

In addition to being the CEO and president of Kruse International, Dean Kruse served as the CEO and president of Auburn Cordage, LLC (Auburn Cordage) at all times relevant.[3] Auburn Cordage owns a 238-acre auction site in Auburn, Indiana, and generates revenue by renting the site to auction companies for the purpose of conducting auctions. Auburn Cordage does not own any "right" to conduct auctions. It merely leases its premises to auction companies that are otherwise authorized to conduct auctions in Indiana.

Diane Jernigan is a longtime personal friend of Dean Kruse, who had been an officer or director at Kruse International for over 30 years at the time it ceased operations in January 2010.[4] At the beginning of March 2010, Jernigan formed Auburn Auctions and the company was subsequently licensed to conduct auctions in Indiana. Auburn Auction's registered address and

---

[3] Despite both parties' occasional misstatements to the contrary, Auburn Cordage is not a party to this litigation.

[4] The record indicates that Jernigan's job title at Kruse International was undefined. However, Jernigan had held a position of considerable power within Kruse International.

phone number are the same as Kruse International's. They share a computer specialist, and are both run out of "the Bunker," a complex that includes Dean Kruse's residence.

From May 13 to May 17, 2010, Auburn Auctions conducted the 19th Annual Auburn Spring Motorfair Auction. Although different entities had conducted the eighteen previous auctions, Kruse International had conducted the several immediately preceding the one held by Auburn Auctions, and had been planning to conduct the 19th Annual auction before it went out of business. The auction was held on the Auburn Cordage grounds. Auburn Auctions did not pay anything to Auburn Cordage to conduct the auction, and Dean Kruse, as CEO of Auburn Cordage, told Jernigan that if she made money on the auction she could pay Auburn Cordage whatever Auction Auctions thought was appropriate. Auburn Auctions also paid no money to Kruse International to conduct this auction. However, Dean Kruse and Jernigan did discuss whether Auburn Auctions should conduct the auction. Auburn Auctions generated approximately $52,000.00 from that auction, all of which has been used to partially offset the costs incurred by Auburn Auctions in conducting the auction, which amounted to approximately $155,000.00.

## DISCUSSION

The Court will first address the pending Motion for Preliminary Injunction. Before concluding, the Court will also rule on the pending Motion for Saunctions.

**A.     Preliminary Injunction**[5]

---

[5] While the Plaintiff moves for injunctive relief pursuant to the IUFTA claim, there is some indication in its briefings that it seeks injunctive relief pursuant to its Count One enforcement action as well. Because that count has been dismissed, the Court will only consider the Motion for Preliminary Injunction as it applies to the IUFTA claim in Count Two.

6

The preliminary injunction analysis in this case turns on the Court's findings as to the issue that it ordered the parties to supplementally brief—whether the right to conduct an auction is a cognizable property right, or asset, under the IUFTA. Therefore, in this section the Court will first present the law regarding the applicable section of the IUFTA. It will then find that an "auction right" is not an asset subject to the IUFTA. In that context, the remainder of this section will briefly analyze the Plaintiff's Motion under the three prongs of the "threshold phase" inquiry that a Court must undertake in ruling on a motion for preliminary injunction. Because the Court finds that this case is not properly governed by the IUFTA, it will likewise find that the Plaintiff fails to meet its burden as to any of the three prongs. As failure to meet any one of the prongs is dispositive, the Court will deny the motion without undertaking the second phase inquiry of balancing equities.

1. **Auction Right Under IUFTA**

The IUFTA states, in pertinent part, that a "transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . : (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer . . . ." Ind. Code § 32-18-2-14. *See also Genteel, Inc. v. Wireless Ventures, LLC*, 362 F.Supp. 2d 992, 1006 (N.D. Ind. 2005). The IUFTA applies to "all transfers made . . . after June 30, 1994." Ind. Code § 32-18-2-1(a).

The IUFTA defines a "transfer" as follows:

(a) As used in this chapter, "transfer" means any mode of disposing of or parting with an asset or an interest in an asset, whether the mode is direct or indirect, absolute or conditional, or voluntary or involuntary.

(b) The term includes payment of money, release, lease, and creation of a lien or other encumbrance.

IND. CODE § 32-18-2-10. As used in the IUFTA's definition of "transfer," "asset" is defined as "property of a debtor." IND. CODE § 32-18-2-2(a). "Property" is defined as "anything that can be the subject of ownership." IND. CODE § 32-18-2-9.

It became clear to the Court during the evidentiary hearing that there was no evidence in this case to suggest that Kruse International had transferred to Auburn Auctions any money, release, lease, or creation of lien or other encumbrance, as contemplated by the IUFTA. Skeptical that this cause of auction fell within the scope of the IUFTA, the Court asked counsel for the Plaintiff the following question: "What assets which are defined property of the debtor has been transferred in the matter defined by the statute between [Kruse International] to Auburn Auctions?" Transcript of June 3 Evidentiary Hearing (hereinafter "Transcript") at 223. The Court reiterated, "what is the property that the plaintiff is contending . . . has been passed between Kruse [International] and Auburn Auctions?" Transcript at 223. Plaintiff's counsel replied, "the right to conduct the . . . Annual Spring Motor Fair Auction . . . . Kruse [International] owns that right. It can go in there to the exclusion of anyone else, conduct its auction. It is a thing it owns. Okay. It is a thing of value." Transcript at 224–25.

In other words, the Plaintiff's position is that Kruse International possessed an intangible right to hold the 19th Annual Spring Motor Fair Auction, which it then fraudulently transferred to Auburn Auctions. The question thus becomes whether an "auction right" constitutes the type of "asset" contemplated by the IUFTA.[6] The Court finds that it is not.

---

[6] The Plaintiff, at the evidentiary hearing, and in precedent and subsequent briefing, makes frequent reference to the allegedly "sweetheart deal" provided to Auburn Auctions by Auction Cordage when Auburn Cordage allowed Auburn Auctions to conduct the auction for a non-fixed sum of money. To repeat, Auburn Cordage is not a party to this lawsuit. The question of the propriety of a contract between Auburn Auctions, which is not the Plaintiff's debtor, and Auburn Cordage, which is a non-party in this lawsuit, is very far afield from the issue before the Court: whether there was a fraudulent transfer from Kruse International to Auburn Auctions. Therefore the Court

Initially, the Court notes that it could not locate, nor did the parties provide, any reference to any Indiana or federal statute that recognizes any "right" of an auction company to conduct an auction. In Indiana, auctions and auctioneers are governed by the Auctioneer and Auction Licensing Act (the Act). The Act "provides licensing and registration for persons engaged in operating, conducting or otherwise producing auctions. No other agency or political subdivision of the state shall impose on a licensee or seller at auction any registration or license requirement or any license or employment fee or charge on account of such auction activities." IND. CODE § 25-6.1-1-2.

The Act sets forth applicable definitions, which do not include a definition of "auction right," or any analogue. IND. CODE § 25-6.1-1-3. The Act, which governs the creation, membership and powers of the Indiana Auctioneer Commission; the licensing of auctioneers and auction houses and the suspension and revocation of such licenses; the performance of licensed auctioneers and auction houses; and penalties for its violation; contains no provision regarding, defining, or recognizing any "auction right," or analogue. *Id.* The concept simply does not exist within the Act. The Court is similarly unaware of any federal statute or case law that governs auctioneering conduct, let alone defining a right to conduct an auction.

In the absence of any applicable statute or common law that recognizes an "auction right," the Court considers the theoretical possibility that Kruse International possessed a contractual right to conduct the 19th Annual Spring Motorfair Auction, which it could have transferred to Auburn Auctions. The uncontested evidence at the evidentiary hearing indicates that no such contract existed. The uncontradicted testimony is that Kruse International entered

---

considers the "sweetheart deal" immaterial to the instant proceeding and will not opine as to it.

9

into a separate lease with Auburn Cordage each time that Kruse International held an auction at the Auburn Cordage site. No testimony was presented to suggest that Kruse International and Auburn Cordage had an agreement that Kruse International was to be the only auction company to hold auctions at the Auburn Cordage site, or that Auburn Cordage was not free to negotiate with other companies. Not only was Auburn Cordage allowed to lease its premises to companies besides Kruse International, it frequently did so. Similarly there is no testimony before the Court that the name "19th Annual Spring Motorfair Auction" was trademarked, or that it was otherwise owned by Kruse International.

The uncontested testimony evidenced that there was no lease between Kruse International and Auburn Cordage to hold the 19th Annual Spring Motorfair Auction, because Kruse International went out of business approximately five months before that auction was to be held. Nor is there any evidence before this Court to suggest that there has ever been any contractual assignment between Kruse International and Auburn Auctions. Jernigan testified, simply and forthrightly, that when she learned Kruse International would be unable to lease the Auburn Cordage site, she became interested in doing so as a licensed auctioneer. She then formed Auburn Auctions, which negotiated its own contract with Auburn Cordage to lease the site.

The Court thus finds that Kruse International could not have and did not possess an "auction right" for the 19th Annual Spring Motorfair Auction either by state statute, federal statute, common law, or contract. Because the Court finds that an "auction right" is not an "asset" pursuant to the IUFTA, it likewise finds that the Plaintiff cannot prove at this stage that *any* transfer of property, fraudulent or otherwise, was made between Kruse International and

Auburn Auctions.

In making this finding, the Court is not dissuaded by the argument advanced by the Plaintiff's second supplemental brief that the right to conduct an auction constitutes "goodwill."[7] As the Plaintiff correctly points out, goodwill is the expectation of continued patronage. *Baker v. Comm'r of Internal Revenue*, 338 F.3d 793 (7th Cir. 2003). However, goodwill cannot be transferred apart from the business with which it is connected. *Id.* Furthermore, "a sale of goodwill takes place only when the business or a part of it, to which the goodwill attaches is sold." *Id.* at 794 (citation omitted).

However, the Plaintiff's argument is that Kruse International, through Dean Kruse giving Auburn Auctions "permission" to conduct the spring auction, fraudulently transferred "goodwill" independent of any business name, customer list, lease, mortgage, or any other property right recognized by law. In making this claim, the Plaintiff does not provide the Court with any case law that supports its proposition. Although the Plaintiff's brief cites about a dozen cases that purportedly evidence the subjection of the transfer of goodwill to other states' versions of the UFTA, every one of these cases involves goodwill that attaches to the sale of part of a business.[8] None of these cases involve goodwill transferred independently of a sale of part of a business, and none of them relate, even tangentially, to a right to hold an auction. Therefore the Court finds that an auction right cannot be transferred, by itself, as goodwill under the IUFTA.

---

[7] The Court will consider this argument on its merits despite the fact that it is raised for the first time in the second supplemental brief to a motion on which two evidentiary hearings have already been held.

[8] Examples include the sale of business names, acronyms, customer information, vendor information, leases, and mortgages.

11

### 2. Preliminary Injunction Analysis

Because the Court has found that there is no such thing as an "auction right" asset under the IUFTA, the matter of conducting a preliminary injunction analysis is largely academic. The Court finds first that the Plaintiff has no likelihood of success on the merits of the underlying IUFTA claim. It has failed at every juncture to provide the Court with the slightest bit of evidence or law that suggests that there was any transfer of any asset between Kruse International and Auburn Auctions, let alone a fraudulent transfer. It then follows that the Plaintiff has not presented any evidence that it will be irreparably harmed by the Court's denying its requested relief of enjoining Kruse International from transferring its right to conduct any auctions (which Kruse does not legally possess). Likewise, the Plaintiff has not made any showing that it will be harmed if the Court denies its motion to enjoin Auburn Auctions from destroying records related to the 19th Annual Auburn Spring Motorfair Auction. Finally, the Plaintiff has not made a showing that the traditional legal remedies in this case (presumably registering its judgment in state court, or pressing forward with its underlying claim under the IUFTA) are inadequate. For these reasons, the Motion for Preliminary Injunction will be denied.

### B. Sanctions

Finally, Kruse's Motion for Plaintiff to Show Cause Why It Should Not Be Held in Contempt [DE 12] alleges that the Plaintiff disseminated copies of its then-sealed Complaint to news media before the Defendants had an opportunity to review the Complaint. The Motion offers no proof that the Plaintiff engaged in such conduct, cites no authority to suggest that such

conduct is sanctionable, and provides no federal rule or authority under which the Court could impose such a sanction. In its Verified Response [DE 14], counsel for the Plaintiff avers that neither he nor the Plaintiff had disseminated any sealed document to any person. Finding no basis to impose sanctions, the Court will deny Kruse's Motion.

## CONCLUSION

For the foregoing reasons, Kruse's Motion for Plaintiff to Show Cause Why It Should Not Be Held in Contempt [DE 12] is DENIED. The Plaintiff's Motion for Preliminary Injunction Upon Emergency Hearing [DE 21] is DENIED. This case will now proceed to a Rule 16 Conference to be scheduled by Magistrate Judge Roger B. Cosbey.

SO ORDERED on August 2, 2010**.**

 s/ Theresa L. Springmann  
THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT
